IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )          No. 22-cr-20262-JTF-tmp
                                   )
ARSENIO CLAYTON,                   )
                                   )
        Defendant.                 )

---

## REPORT AND RECOMMENDATION

---

Before the court by order of reference is defendant Arsenio Clayton's Motion to Suppress. (ECF No. 22.) For the reasons below, the undersigned recommends that the motion be denied.

### I.   PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the evidence presented at the suppression hearing. The evidence included the testimony of Shelby County Sheriff's Office ("SCSO") Deputies Keith Keppen, Richard Phillips, and Stanford McNeil, body-worn camera footage from Deputies Keppen and Phillips, video from inside Deputy McNeil's police car, the SCSO vehicle tow-in policy, and the tow-in form for Clayton's vehicle. The undersigned finds the testimony of the three officers credible and consistent with the video evidence, and therefore adopts their version of the events as the proposed findings of fact.

On April 6, 2021, at around 10:12 a.m., SCSO deputies received a call reporting a domestic disturbance at 8084 Waterford Circle in Memphis, Tennessee. (Tr. p. 6.) The complainant reported that a Black man wearing a white shirt and black pants had fired a gun in the air. (Id.) When officers arrived at the scene, they saw two cars stopped in the middle of the street in front of the 8084 Waterford Circle address, facing each other with their front hoods raised. (Ex. No. 1 at 0:48.) A Black man in a white shirt and long black shorts (which went past his knees) was standing by the rear of one of the cars, a white Chevrolet Equinox. (Id.; Tr. pp. 25, 38.) Deputy Keppen testified the police believed this individual to be a suspect in the disturbance, and that it appeared that his vehicle had "broken down" and that he was attempting to get it jump started. (Tr. p. 10.) The man, later identified as Arsenio Clayton, was seen holding a plastic grocery store bag, which he immediately placed on top of the roof of the Equinox. (Ex. No. 1 at 0:56; Tr. p. 11.) The driver's door of the Equinox was open. (Ex. No. 1 at 0:56.) An officer patted Clayton down and found no weapons. (Tr. p. 16.) During the pat down, Clayton indicated toward the Equinox and referred to it as "my vehicle." (Ex. No. 1 at 1:10.) Another officer ran the Equinox's tag number and confirmed that it belonged to Clayton. (Tr. p. 38.)

Deputy Phillips then approached the front door to 8084 Waterford Circle and spoke to Clayton's nephew. (Tr. p. 50.) The

nephew told Deputy Phillips that Clayton had been "disturbing the neighbors," refused to allow Clayton's sister to "get her stuff," took out a gun and "shot in the air," and then got in his car before it stalled on the street. (Ex. No. 2 at 0:56–1:15.) He also stated that the gun was "more than likely" in the car and pointed to the area where he believed officers would find the shell casing. (Id. at 1:23–1:28.) Deputy Keppen, meanwhile, approached the Equinox and looked through the open driver's door as well as the car windows. (Tr. p. 12; Ex. No. 1 at 3:27-4:10.) He testified that he had reasonable suspicion that a gun was in the vehicle because, based on the report they had received, the suspect had fired a gun and then gotten into a car. (Tr. p. 12.) Around this time, Deputy Phillips walked toward the spot on the street where Clayton's nephew had pointed to (behind the Equinox) and discovered a spent shell casing. (Id.) Deputy Phillips then "put both of [his] wrists together hitting them simultaneously," a gesture signaling to other officers to place Clayton in handcuffs. (Tr. p. 51; Ex. No. 2 at 1:49.) Deputy Phillips explained that he made the gesture because "based on the call that we got and . . . finding the shell casing it was time to just go ahead and cuff him and detain him." (Tr. p. 51.) At that point, Deputy Phillips testified that he had probable cause to arrest Clayton for reckless endangerment and that Clayton was, in fact, under arrest. (Tr. pp. 51-54.) Clayton was handcuffed and placed in the back of Deputy McNeil's squad

- 3 -

car. (Tr. pp. 54, 80–81.) Deputy Phillips then notified dispatch that he had found the shell casing. (Tr. p. 52; Ex. No. 2 at 2:03.) At this time, Deputy Keppen, who was aware of the discovered shell casing and Clayton being handcuffed, picked up the plastic bag from the roof of the Equinox. (Tr. pp. 13—15; Ex. No. 1 at 3:31, 5:26.) He testified that he "decided to check it since it was on [Clayton's] person when" the police first arrived. (Tr. p. 13.) The bag was tied closed and had a rip in its side. When Deputy Keppen reached for the bag, he felt a hard object in it with "some weight to it[.]" (Id.) He placed the bag on the ground, reached through the ripped part of the bag, and removed a gun that was wrapped in a towel. (Id.) Deputy Keppen determined that the weapon was loaded. (Tr. p. 14.)

Around this time, Clayton's sister came out of 8084 Waterford Circle. (Tr. p. 52; Ex. No. 2 at 3:23.) Clayton, while in the back of Deputy McNeil's patrol car, was asked whether he wanted to leave the Equinox with his sister. (Tr. p. 84.) He initially declined before changing his mind and saying he wanted it released to her. (Id.) After some talking more with officers, Clayton changed his mind again, agreeing to allow officers to tow the Equinox. (Tr. p. 85.) The Equinox was then towed. (Tr. p. 74.)

Clayton was later indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On October 27, 2023, he filed a motion to suppress the gun found in the plastic

grocery bag. (ECF No. 22 p. 10.) He argues that although the officers had reasonable suspicion to justify the initial investigative detention and pat-down, they did not have any lawful basis to search the grocery bag. (Id. at 6.) He contends that Deputy Keppen was not acting in a community caretaking capacity when he searched the bag, the search was not incident to arrest, and the inevitable discovery doctrine is inapplicable.[1] (Id. at 6–9.) The government responds that the search of the bag was justified as a search incident to arrest, the automobile exception applies, and the gun would have been inevitably discovered through an inventory search pursuant to SCSO's vehicle tow-in procedures. (ECF No. 23 p. 2–9.)

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Reasonable Expectation of Privacy

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "[T]he State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a constitutionally protected reasonable expectation of privacy." New York v. Class, 475 U.S. 106, 112 (1986) (internal quotation marks

---

[1]In its response brief, the government does not argue that the community caretaking exception should apply in this case.

omitted). Clayton had no reasonable expectation of privacy in the *exterior* of the grocery bag as it sat on the roof of the Equinox. However, the bag was tied closed, and because there does not appear to be any claim by the government that Clayton abandoned the bag when he placed it on the roof, he did have a reasonable expectation of privacy in its contents. See United States v. Ross, 456 U.S. 798, 822 (1982) (holding that there is a reasonable expectation of privacy in the contents of a person's closed containers, and that "[t]his rule applies equally to all containers[.]").

"Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). "Probable cause exists where 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Wright, 16 F.3d 1429, 1437 (6th Cir. 1994) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The determination is a "commonsense, practical question" based upon the totality of the circumstances. Gates, 462 U.S. at 230-31. "This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective," taking into account law enforcement training and experience. Ferguson, 8 F.3d at 392.

Here, the undersigned finds that the officers had probable cause that the firearm was located either in the Equinox or the grocery bag. Clayton was wearing clothes consistent with the description of the suspect given by the complainant. (Tr. pp. 6, 25, 38.) The officers patted him down and did not find any weapons on him. (Tr. p. 16.) The officers recovered a shell casing not far behind Clayton's vehicle, and his nephew told officers the gun was "more than likely" in the car. (Tr. pp. 12, 50; Ex. No. 2 at 1:23-1:28.) With this knowledge, as well as knowledge that Clayton entered the car and attempted unsuccessfully to drive away, it was reasonable for the officers to believe that there was a fair probability the firearm was either inside the car or in the bag that he placed on the roof.

However, even though Deputy Keppen had probable cause that the gun was inside the grocery bag, that alone did not give him authority to search the bag. "A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant." United States v. Jacobsen, 466 U.S. 109, 120 n.17 (1984) (citing Ross, 456 U.S. at 809-12). The officers were not permitted to conduct a search of the contents of the grocery bag unless an exception to the warrant requirement applied. See United States v. Place, 462 U.S. 696, 701 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have

not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents."); see also United States v. Mincy, No. 1:20-cr-61, 2022 WL 17176398, at *3 (S.D. Ohio Nov. 23, 2022) (stating that when police arrest a suspect on foot, "they have a right to search the suspect's pockets, and even open containers, e.g., wallets," but that "arrestees retain a reasonable expectation of privacy as to the contents of any closed containers like briefcases, duffle bags, and purses that they may be carrying") (citing United States v. Chadwick, 433 U.S. 1, 11 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991)).

## B.   The Automobile Exception

"Under the automobile exception to the warrant requirement, 'an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Johnson, 707 F.3d 655, 658 (6th Cir. 2013) (quoting United States v. Redmond, 475 F. App'x 603, 607 (6th Cir. 2012)); see also United States v. Whipple, 92 F.4th 605, 613 (6th Cir. 2024) ("The automobile exception relieves law enforcement officers of the requirement to obtain a warrant before seizing and conducting a search of an automobile where probable cause exists to believe that evidence of a crime will be found in the car."). "If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may

search "any area of the vehicle in which the evidence might be found" without a warrant. Arizona v. Gant, 556 U.S. 332, 347 (2009) (citing Ross, 456 U.S. at 820–21); see also United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) ("Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime."). If law enforcement has probable cause to search a vehicle under the automobile exception, this probable cause extends to all containers in the vehicle that "might contain the object of the search." Ross, 456 U.S. at 821–22. A search under the automobile exception "may include all parts of a legitimately stopped vehicle, including the trunk and all containers." United States v. Harris, 578 F. Supp. 3d 930, 936 (E.D. Mich. 2022) (citing United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002)).

The automobile exception was traditionally based on the "'ready mobility' of the automobile, which created 'an exigency sufficient to excuse failure to obtain a search warrant.'" United States v. Smith, 510 F.3d 641, 647 (6th Cir. 2007) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) and California v. Carney, 471 U.S. 386, 390–91 (1985)). However, courts now hold that "the automobile exception need not rest on an independent showing of exigency, because 'even in cases where an automobile was not immediately mobile, the lesser expectation of privacy

resulting from its use as a readily mobile vehicle justified application of the vehicular exception.'" United States v. Galaviz, 645 F.3d 347, 355 (6th Cir. 2011) (quoting Smith, 510 F.3d at 647); see also Whipple, 92 F.4th at 613 ("Even, as here, when a car has been immobilized because the owner can no longer drive it, the justification for a warrantless seizure of a car does not vanish."). Although the automobile exception typically applies to evidence found inside a vehicle, in certain circumstances, courts have extended the exception to containers attached to the vehicle's exterior, so long as probable cause existed that the containers stored evidence of a crime. See, e.g., United States v. Schanon, No. 10-296 JRT JJK, 2011 WL 1261097, at *2 (D. Minn. Apr. 4, 2011) (finding that, because there was probable cause, an eyeglass case attached to a car's exterior could be searched under the automobile exception).

This case presents a unique question regarding the application of the automobile exception - whether the exception applies to a grocery bag placed on top of a vehicle. In Schanon, the District Court for the District of Minnesota determined that an eyeglass case that was taped shut and attached to the bottom of the defendant's car with a magnet fell within the automobile exception and could therefore be opened and searched without a warrant. 2011 WL 1261097, at *1-2. The officers conducting the search had been tipped off that Schanon kept a container for

contraband under the car, and they conducted the search during a vehicle stop. Id. at *1.

Clayton's case is distinguishable from Schanon, however. In Schanon, the eyeglass case was magnetized to the bottom of the car, making it an extension of the car itself. The magnetized case was designed to travel as part of the car and, given that the police encountered the defendant during a traffic stop, had already done so. Here, the grocery bag on top of the car had no tether to the car itself. Were the car to drive off — even slowly — the bag would have fallen to the ground. (Ex. No. 1 at 3:06, 3:54.) Although the automobile exception is no longer based only on exigency, "even in cases where an automobile was not immediately mobile," the "lesser expectation of privacy" in a car still "result[s] from its use as a readily mobile vehicle." Galaviz, 645 F.3d at 355 (internal quotation omitted). Containers that can serve as the natural extensions of a vehicle possess the same potential mobility as does the car, but containers placed on a vehicle that are neither attached nor tethered do not. The tied grocery bag was more akin to a briefcase, duffle bag, or purse, and Clayton's car served as little more than a platform on which the bag was placed, functioning more akin to a table than to a vehicle capable of mobility contemplated and given special exception under the Fourth Amendment. For this reason, the undersigned finds that, even though Officer Keppen had probable cause that the gun was inside the

grocery bag, the search of the bag does not fall under the automobile exception to the warrant requirement.

## C.  Search Incident to Arrest

Police officers may conduct a warrantless search incident to a lawful arrest of an arrestee and the area within the arrestee's immediate control. Chimel v. California, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use . . . [because a] gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested."); see also United States v. Latham, 763 F. App'x 428, 430 (6th Cir. 2019) (citing Chimel and noting that "[t]he search incident to lawful arrest exception is primarily intended to ensure that a suspect does not have immediate access to weapons or the ability to destroy evidence."). The Supreme Court in Arizona v. Gant held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. at 351; see also United States v. Henderson, No. 22-1561, 2024 WL 51319, at *2 (6th Cir. Jan. 4, 2024) (applying Gant). In other words, a lawful search-incident-to-arrest extends to two circumstances: (1) "if

- 12 -

the arrestee was unrestrained and within reaching distance of the area at issue at the time of the search," or (2) "it was reasonable for the arresting officers to believe that evidence relevant to the crime of arrest might be found in the vehicle." United States v. Buford, 632 F.3d 264, 269 (6th Cir. 2011) (citing Gant, 556 U.S. at 351).

For the same reasons already discussed regarding the inapplicability of the automobile exception, the grocery bag's close proximity to the Equinox would not make it reasonable for the arresting officers to believe that evidence relevant to the crime of arrest might be found "in the vehicle." While some courts have interpreted the second prong of Gant to extend to the trunk area, the undersigned is unaware of any case that has extended this prong of Gant to reach detached containers outside of the vehicle. Compare United States v. Allen, No. 4:08-CR-40, 2009 WL 3297286, at *3 (E.D. Tenn. Oct. 13, 2009) (refusing to extend Gant to the trunk area), and United States v. Arnold, No. 08-20556, 2009 WL 3101000, at *6 (E.D. Mich. Sept. 23, 2009), aff'd, 442 F. App'x 207 (6th Cir. 2011) ("[A] search incident to Arnold's arrest for resisting and opposing the police officers would not justify a search of the trunk under the Supreme Court's recent decision in [Gant]."), with United States v. Hunt, No. 23-1616, 2024 WL 50464, at *1 (7th Cir. Jan. 4, 2024) ("When conducting a search incident to arrest, police may search all areas in the vehicle in which

evidence of criminal activity may be found, including trunks and glove compartments[.]"). Regarding the alternative basis for a search incident to arrest under Gant, as shown on the body-camera video, Clayton was handcuffed and nowhere close to reaching distance from the bag or the car when Deputy Keppen searched the bag. See United States v. McCants, No. 2:22-CR-20320-TGB-APP, 2023 WL 4068565, at *9 (E.D. Mich. June 16, 2023) (search incident to arrest exception did not apply to backpack where defendant was handcuffed and moved away from backpack before it was subjected to drug dog sniff and then searched); United States v. Vining, No. 2:21-CR-20715-TGB-DRG-1, 2023 WL 3720911, at *13 (E.D. Mich. May 30, 2023) (search incident to arrest did not apply where defendant left his bag in the bus loading area from the moment he was approached by the officers, was then arrested and moved to a nonpublic area, and officers retrieved bag and searched it). The undersigned finds that the search incident to arrest exception does not apply to the search of the bag.

**D.    Inevitable Discovery Through Inventory Search**

Even though the officers were not justified in conducting the search under either the automobile exception or as a search incident to arrest, the undersigned nonetheless finds that the firearm would have been inevitably discovered based on the inventory search exception to the warrant requirement. "The inevitable-discovery doctrine provides that where 'tainted

evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.'" United States v. Witherspoon, 467 F. App'x 486, 490 (6th Cir. 2012) (quoting Murray v. United States, 487 U.S. 533, 539 (1988)). "In the Sixth Circuit, the [inevitable discovery] doctrine applies when there . . . [are] 'compelling facts' [that] demonstrate that discovery was inevitable." McCants, 2023 WL 4068565, at *10. The exception requires the court to determine, "'viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" United States v. Kennedy, 61 F.3d 494, 498 (6th Cir. 1995) (quoting United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992)). "[O]ne of the specific showings the government can make is that 'routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.'" United States v. Joy, No. 13-20180-STA-tmp, 2014 WL 288936, at *8 (W.D. Tenn. Jan. 27, 2014), aff'd, 658 F. App'x 233 (6th Cir. 2016) (quoting United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999)).

"Proof that contraband would have been detected in 'an inventory search that would inevitably follow seizure of a car' is sufficient to invoke the inevitable discovery exception to the exclusionary rule." United States v. Kimes, 246 F.3d 800, 804 (6th Cir. 2001) (quoting Kennedy, 61 F.3d at 498). Inventory searches

"'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987). "The ultimate touchstone of the Fourth Amendment is reasonableness." United States v. Parrott, No. 15-20282-SHM-tmp, 2016 WL 11478133, at *4 n.5 (W.D. Tenn. Apr. 13, 2016), report and recommendation adopted, No. 15-20282, 2016 WL 3211445 (W.D. Tenn. June 9, 2016), aff'd, No. 16-6538, 2017 WL 4712062 (6th Cir. Aug. 17, 2017) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Therefore, to pass the Fourth Amendment's reasonableness requirement, an inventory search "may not be undertaken 'for purposes of investigation,' and must be conducted 'according to standard police procedures.'" United States v. Smith, 510 F.3d 641, 651 (6th Cir. 2007) (quoting Lumpkin, 159 F.3d at 987). "However, the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." Id. (citing Lumpkin, 159 F.3d at 987).

In the present case, the SCSO vehicle tow-in policy states in relevant part:

b. Arrests and Search Situations

(1) When a suspect is arrested and there is probable cause to believe that the vehicle he was operating is needed for evidentiary purposes, the vehicle should be towed and a hold placed on the vehicle for the investigative bureau. This includes situations where the

car is needed for identification purposes (i.e., getaway car) or is needed for processing. As long as an officer has probable cause to believe that the vehicle was used in the commission of a crime or contains evidence or contraband, the vehicle may be legally searched. This includes the locked glove compartment and the trunk. Any time an officer tows a vehicle in for these purposes, a notation is to be made on the 195.15a Tow-In Form that the vehicle is to be held for whatever investigative bureau is involved. If an offense report is submitted, the information concerning the towing of the vehicle is to be contained in it. If no offense report is submitted, then a memo should be submitted to the investigative bureau.

(2) Arrests Where the Suspect's Vehicle Is Not Needed as Evidence: When an officer arrests a defendant and the defendant's vehicle is not needed as evidence, the officer is now required by the Tennessee Supreme Court case of Drinkard v. State (1979) to allow the defendant to leave the vehicle on the scene of the arrest if he/she so desires. The defendant may turn the vehicle over to another party in the vehicle or park the vehicle. The defendant must, however, be able to park the vehicle in a legal parking zone. He/She cannot request to park his vehicle in an illegal parking zone, in any place which would obstruct traffic, or on any private property without the consent of the owner of that property. In any case in which the owner wants to release his/her vehicle to a third party or to park the vehicle, he/she is required to sign a 195.15b Tow-In Option hold harmless agreement. If the vehicle cannot be properly parked or released to a third party, it should be towed.

. . .

d. Obstructing Traffic and Parking Violations

(1) When a vehicle is obstructing traffic and the owner/operator is not available, then the vehicle should be towed.

. . .

g. Inventory of Vehicles

(1) Vehicles shall be inventoried whenever they are towed. The purpose of an inventory is to protect the officers and the Sheriff's Office from civil claims of larceny by the owner/operator and to safeguard the owner's property. Therefore, if a vehicle is left on the street (i.e., the release has been executed) or driven away by a friend or relative of the arrestee, no inventory should be undertaken.

(2) An inventory shall include the area of the vehicle to which we have access. If the keys to the trunk and/or glove compartment are in our possession, we shall inventory these areas even if locked. If we do not have these keys and the compartments are locked, we should not inventory them. If the compartments are unlocked, they shall be inventoried. All property found is to be listed on the 195.15a Tow-In Form as part of the inventory.

(Ex. No. 3 pp. 62–65.)

The government argues that section (b)(2) of the SCSO tow-in policy would have applied, regardless of whether or not Deputy Keppen had found the gun. (ECF No. 23 p. 8.) Clayton first argues that because officers never actually checked whether the Equinox could start, they were premature in assuming that the car was stuck and therefore illegally parked. (Tr. p. 93.) During the suppression hearing, Clayton claimed that "[t]here's no indication that it had to be left in the middle of the road as it was making it [sic] blocking traffic or as per the policy where it would be towed because it was a nuisance to the community." (Id.) Based upon the officers' observations, the car appeared to be disabled. However, SCSO tow-in policy (b)(2) only discusses whether the car was "obstructing traffic[,]" not whether the vehicle is wholly

immobile. (Ex. No. 3 p. 63.) Because the car was stopped in the middle of the road, regardless of whether it was disabled or not, it was obstructing traffic and therefore the officers were authorized to allow it to be towed.

Detective Dodson gave Clayton the opportunity to leave the car with his sister. (Id. at 0:09.) First, Clayton said he did not want his sister to take it. (Id. at 0:12.) Then, he changed his mind and said he wanted his sister to take it. (Id. at 0:16.) Ultimately, Clayton then changed his mind again and stated his desire for the police to take the car. (Id. at 1:30.) He now argues that the officers violated SCSO tow-in policy (b)(2) because the only person they offered Clayton to leave the car with was his sister – the person with whom he had just had a dispute. (Tr. p. 93.) Clayton insists that the police were required to offer him the option of leaving his car with one of the other people standing around. (Id.) But neither the SCSO policy nor the case law requires the police to exhaust every possible third party who might be eligible to take possession of the car. In the instant case, the undersigned finds that the officers received valid consent under their policy.

This district has previously addressed third parties' roles with tow-in policies. In Graham, the court wrote the following:

> The fact that Defendant had a family member present on
> the scene early on in the process is highly probative.
> Had the officers simply wished to get the car off the

> street and legally parked, the officers should have
> complied with [the Memphis Police Department]'s tow-in
> policy, explained Defendant's options to him, and then
> decided whether to allow one of the family members to
> move the car. After all, the traffic stop occurred on a
> residential street only a short distance (about a block)
> from Defendant's own driveway. Instead, the officers
> admitted that they did not engage any family members at
> the scene, failed to explain to Defendant that he had
> the option of allowing a third party to move the car,
> and did not contact a supervisor prior to requesting the
> tow truck. True, the officers' decision to tow the car
> did not violate the Fourth Amendment "simply because
> alternatives to impoundment might [have] exist[ed]." But
> if Officer Dawson searched the vehicle only after the
> call for the tow truck, his search took place after
> Defendant's family was there. It would appear then that
> the officers pressed ahead with impoundment in spite
> of the presence of third parties on the scene. The Court
> holds that under those circumstances a search of the car
> would be unreasonable.

Graham, 2015 WL 4078299, at *12 (quoting United States v.

Hockenberry, 730 F.3d 645, 658 (6th Cir. 2013)) (internal citations

omitted). As was the case in Graham, Clayton's family was present

at the scene.

But there are several distinctions between Graham and the

instant case. The Memphis Police Department policy in Graham stated

the following:

> The defendant may authorize a third party at the scene
> who is not under arrest to legally park the vehicle. The
> defendant will not be allowed to move his vehicle once
> he has been arrested. Under no circumstances will an
> officer on the scene drive the vehicle with or without
> the owner's consent. *These options must be explained to
> the defendant before the decision to tow is made.*

Id. at *3 (emphasis added). By contrast, SCSO tow-in policy (b)(2)

notes that when they do not need the car as evidence, officers

"may turn the vehicle over to another party in the vehicle or park the vehicle" and later references that the car can be "released to a third party[.]" (Ex. No. 3 p. 63.) The SCSO policy does not require officers to explain this option to the arrestee. (See id.) Nonetheless, unlike in Graham, Officer Dodson *did* explain Clayton's options to him. Although he was not required to do so, Officer Dodson offered Clayton the opportunity to leave the car with his sister. The undersigned finds that Officer Dodson sufficiently complied with the department policy that Clayton be allowed to leave the vehicle with a third party, and he received valid consent from Clayton to allow its tow.

Under SCSO tow-in policy (b)(2), the firearm would have been inevitably discovered because the officers would have placed the grocery bag in the car. The government explained that SCSO officers would have "move[d] the bag to place it in the vehicle and check the bag for valuables to document before towing," in compliance with SCSO standard procedures, which would have resulted in discovery of the firearm. (ECF No. 23 p. 8.) Deputy Phillips testified that he would have placed inside the car anything "left outside of the vehicle or on top of the vehicle[.]" (Tr. p. 65.) As mentioned earlier, an inventory search is designed to protect both the owner and the police from damage, destruction, or loss of the owner's property. Lumpkin, 159 F.3d at 985. Thus, it would have been reasonable for officers to inventory the bag along with

the car because to do anything else could have resulted in damage or theft to Clayton's property.

In cases where the arresting agency had similar inventory policies and procedures, courts have denied motions to suppress on inevitable discovery grounds. For example, in Parrott, police officers recovered a firearm while performing an inventory search of a vehicle prior to initiating the tow. 2016 WL 11478133, at *1. The defendant's motion to suppress was denied on inevitable discovery grounds because the officer's actions were reasonable and followed his agency's inventory procedures. Id. Additionally, other courts have upheld the validity of inventory searches with a greater level of intrusion than the search that occurred of Clayton's bag. In Lumpkin, a police officer searched the engine compartment of the defendant's vehicle, finding one pound of methamphetamine. 159 F.3d at 985. The court found that the arresting agency's policy of having officers search the engine compartment was reasonable, affirming the lower court's denial of the defendant's motion to suppress on inevitable discovery grounds. Id. Like the policy in Lumpkin, the policy here that allows officers to move objects from the top of a vehicle to the inside of the vehicle for a later inventory search is reasonable. To the extent that inventory searches are lawful and can satisfy the inevitable discovery exception, because these searches "serve to protect an owner's property while it is in the custody of the

police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger," SCSO's policy accomplishes this goal in a reasonable manner. See id. (quoting Bertine, 479 U.S. at 372). Finally, the undersigned notes that the car was, in fact, towed. (Tr. p. 62.) Here, there is strong evidence that the "routine procedures that police would have used regardless of the illegal search would have resulted in the" eventual inventory of the contents of the bag and discovery of the gun. Joy, 2014 WL 288936, at *8 (internal quotations omitted). The gun would have been inevitably discovered, and therefore suppression is not warranted.

### III. RECOMMENDATION

For the reasons above, it is recommended that Clayton's Motion to Suppress be denied.

Respectfully submitted,

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

March 15, 2024
Date

**NOTICE**

**NOTICE WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**